Thank you. Thank you. So we're ready to proceed to the next case on our calendar, which is also set for oral argument. That is New York Hotel Trades Council and Hotel Association of New York City v. Impax Laboratories. Good morning, and may it please the Court. Luke Brooks for the appellant. I'm hoping to reserve three minutes for rebuttal, and with the Court's permission, I'd like first to discuss the loss causation issues related to the claims arising out of defendants' alleged price fixing, and then the 2016 false statements concerning diclofenac and erosion in Impax's generic drug portfolio and time-permitting then-discussed cyanide to euthesinide. So starting with the price fixing, the District Court correctly found that falsity and materiality were plausibly alleged, but dismissed on loss causation, and this was error. There are four sets of statements in this case that removed fraud-related inflation from Impax's stock price. Those are summarized in our reply brief starting on page 9, and those statements fall into two general categories, disclosures relating to government action and disclosures relating to the financial impact on Impax when additional manufacturers were absorbed into the conspiracy. Starting with the government action, the District Court incorrectly applied an absolute rule that announcements of DOJ investigations and disclosures about those investigations cannot satisfy loss causation absent a subsequent finding of guilt or a disclosure of falsity, and that's not the law in this circuit. There is no bright line rule in the Ninth Circuit as the case in First Solar, which was an interlocutory appeal from a summary judgment order and a certified question as to the correct standard for causation in the Ninth Circuit, and when the panel in First Solar ruled, they ruled that the ultimate issue is whether the defendant's misstatements, as opposed to some other fact, foreseeably caused plaintiff's loss. So the question here is whether these disclosures related to government action on the price fixing issue were the foreseeable consequence of defendant's concealment of false statements about their engagement in price fixing, or were the stock price declines caused by something else, and it's clear from the record that this was a foreseeable consequence and that there were no other possible explanations for the disclosure of a subpoena that Impacts received in May of 2015 following two subpoenas that the market was aware of. Wait a minute, wait a minute, excuse me. The subpoena, forgive me for interrupting, but the sequence is quite important, at least in my notes. You just said the subpoena was received in May of 2015. It was announced by Impacts in May of 2015. I think they received it two months earlier. That's correct, Your Honor. Okay, thank you. Forgive the interruption. It was disclosed in May of 2015 that Impacts had received this subpoena, and the subpoena came on the heels of a subpoena, two subpoenas that had been issued to Impacts employees, and the subpoena specified, and the disclosure specified, that the subpoena involved the digoxin drug, which is at issue in this case. Right, counsel, can I interrupt here so I can get directly to the question that I want you to answer, if you wouldn't mind too much. We understand the facts. We've got a lot of notes about the facts of this case. The panel, I'm sure, has read this all very, very carefully. Here's my problem. It's in your case. This is kind of unique, it seems to me. My understanding, correct me if I'm wrong, is that on May 11th, really two announcements were made by the company. One was this drop in margins, right, from 61% to 47%, but the same day, an announcement of, oh, by the way, we got a subpoena eight weeks ago. First of all, do I have that right, two announcements the same day? Right, your honor. Okay, so plaintiffs are going to have a, probably, I would think, although we're at the 12B6 level, a challenging time trying to figure out what the market was reacting to. They alleged there was a drop the next day, I don't know, 2.7% or something, but setting that aside for a minute, do we have any comparable case file? You know, the district court, I think you're right. It's clearly relied on loose, where we said that's not enough, announcement of investigation is not enough, but there were two announcements that day, and my concern is this strikes me as a real significant expansion of loose. If a delayed announcement of a subpoena, effectively, would act to insulate what may or may not otherwise be an actionable claim. Is there any case law like that? Your honor, I can't think of circuit level cases that address the issue of confounding factors in a disclosure. In other words, two factors that would lead to a stock price decline. Generally, those are issues for experts, and the experts use economic tools to separate out the cause of the decline, and so what we have here, your honor, is the standard is that the disclosure has to be a substantial cause of the stock price decline, and so courts have held, and in fact, in First Solar, the district court at the summary judgment levels, Judge Campbell, held that even a disclosure with multiple factors, as long as there was a substantial contribution from one of the factors, can contribute to the decline. In this case- Is there any, forgive me for interrupting, sometimes you freeze up just a little bit, I can hear your audio, and then I think you stopped talking, so forgive me if I talk over you, I don't mean to, but on this, again, we're just looking at the complaint, well, second amended complaint, but I can't see, and it's a long second amended complaint, I don't see anything in there, if I've missed it, please correct me, that explains this eight-week delay in the announcement of the subpoena. Your honor, I don't believe there's anything that explains the eight-week delay. I think that it's likely a factor of when they disclose their before this last question was, in this case, we allege that both of the disclosures on that date were, in fact, related to the fraud. I had separated them out because I think that they're sort of distinct legal issues. One is the government action, and the other is the impact of conspirators, new conspirators joining, and the loss of market share there. But even if the court finds that one or the other of those is legally insufficient, and I don't believe the court should, the other one would stand if sufficient, because each is a contributing factor, and at this stage, I don't believe it's appropriate to sort of make assessments that are really left to the experts at the end of the case as to parsing how much each of these declines contributed. Can I just interrupt for a second? I had thought that you would suggest that there might be some ulterior motive in the delay of announcing the subpoena by eight weeks. You're waiting to announce the subpoena when you show that there's a problem with their finances, and so therefore sort of discredits the impact of that, and they use loose, then, to say that they should be protected. It should not be a problem by disclosing this subpoena. But it raises a broader question for me. I mean, you've got two sets of statements. You've got the statements in regard to the financial condition of the organization, but then the governmental action. And Luce says, obviously, governmental action is speculative. It cannot be loss causation. But that's only one particular government action. Here, I thought your point was there are multiple problems in later disclosures, like not one, but two CEOs of competing companies pleading guilty to felonies, allegations that the plaintiff or the defendant would have been engaged in criminal behavior, and there's an investigation for criminal behavior. It's not just the disclosure of an investigation. It's much more than that. And at some point, I thought you were arguing degree. At some point, you go from loose situation, which is not causation, to something with a lot more information in the Am I right about this? First is that First Solar expressly states that Luce is not a general rule. Luce is a specific ruling based on the way the plaintiff led their complaint. And so the general rule is a general approximation. But the court is correct that in our case, we have not just one disclosure. And in Luce, by the way, it was not a criminal investigation. It was just an internal investigation at the company. But we also have subsequent disclosures and the government's intervention into the civil action. But Mr. Brooks, if I recall correctly, nothing in the Luce opinion limited the holding to internal investigations by a company. And I guess you're arguing that it should be limited to that. I guess I wanted to know if you had any other authority. The limitation that First Solar imposes on Luce and Metzler and Oracle is that these cases don't state general rules. The question in First Solar was, is it required for a plaintiff to show that the fraud was revealed, the fraudulent practices were revealed? And the answer to that question was no, and that these cases should not be viewed as general rules. Now, a criminal investigation is more serious to the market than an internal investigation. So to the extent that we're assessing the market's reaction and whether it's reasonable, the answer is that a criminal investigation is much more important. But Luce explicitly held that an investigation by itself is insufficient for loss causation. And I guess, again, I guess it's the same sort of question. Why isn't this just another investigation? You're arguing here that because it was a criminal investigation, that that is of significance. Well, it's significant not just because it was a criminal investigation, but because there were a series of investigations. And then also, Your Honor, the way that the plaintiffs and Luce set up their case and the standard that Luce applied was based on that pleading was that the fraud had been disclosed. The market knew of the guilt. And we don't need that. We haven't pled that, and that's not required. And First Solar expressly addresses that question. That was the question posed to the court on an interlocutory review on the only question there was, can a plaintiff show proximate causation or does fraud have to be revealed? And the court says. But Luce counsel, Judge McGee is right. Luce says any decline in a corporation share price following the announcement of an investigation does not reveal fraud to the market, period. Now, Naveen says you don't have to show that fraud was revealed to the market yet. So there you've got that. And then you repeatedly refer to First Solar. But Naveen first. Sorry, Luce also has a footnote right there, right at this very broad holding that says, well, we're just saying that standing alone, that's not enough. That's Judge Sessions is point. It seems to me you're what the point you're really making is you don't. Your contention is not that the investigation, criminal or civil standing alone is enough. If I've got that wrong, I seriously need you to correct me. Well, Your Honor, it's two points. The first is the question is whether these were foreseeable, a foreseeable consequence and approximately connected. And the answer is yes. And that gets us to causation to the extent that there is a question as to whether there's simply just an investigation here or the announcement of investigation. We've alleged more. We've alleged that the government intervened in a civil action and said this civil action pleads the facts that are similar to what's going on in our case. So it leads credence to the government's position. And in addition, you have co-conspirators, other actors in the market, pleading guilty, etc. If the court. Let me ask you before your time is up here. I wanted to ask you about defendant's share, because I know that you argue that I think it was Defendant Wilkinson made false statements regarding the Daiko-Laflinac on February 2nd, 2016 and May 10th, 2016. And one example includes Defendant Wilkinson stating that impacts defendant's share but had to give up a bit of price. I guess why aren't statements like defendant's share non-actionable, puffery or opinion? I wanted to give you an opportunity to respond to that. Yeah, Your Honor, in drug sales and revenues, there are going to be two factors, market share and price. This is a critical metric for the Daiko-Laflinac drug, and it's an objectively verifiable metric. And I think the closest case that we have on the defendant's point is Quality Systems, where the court found statements about a good pipeline for sales and analogous statements to be actionable, non-puffery. And defendant's share is a metric. It's not an opinion. And in the same statement, they also make a false statement about price. So their point that they're giving is... How can we measure that objectively? You said it's an objective, or it's an objective metric. How can we measure that objectively? Well, impacts has admitted that they didn't defend share, that they had lost share at the point that that statement was made. They'd lost share the quarter before, and they were in the middle. No, those are two different things. That's the point right there. You just said they admitted they didn't defend share because they lost share. What that tells me is maybe they didn't defend it successfully if they lost, but the statement made that you're challenging is that they defended share. Is it really your contention they didn't attempt to defend their market share? Well, what they said to the market was, we've defended share but had to give up a bit of price. The overall decline was around 10%. And the questions that are being posed by the analysts at this conference call relate to how their Diclofenac is performing. Yes, sir, but what you said is that you can tell it's false because in fact they lost market share. The statement actually made was we've defended share. So it's not a match-up. What defended share means is that we didn't give up share. We defended share and we gave up price. If competition in an actually competitive market comes in, and you have two choices if you want to stay in that market, you can either give up market share or you can lower your price. I appreciate that, but you're not responding to the point that I'm making. Your brief, I think, misstates the statement that actually was made. The statement wasn't that they didn't lose market share. The statement was we defended share. And I think your response to Judge Merguia when she said, how do we know this is false, basically, is that in fact they lost market share. Those are two different things. The statement was we defended share. Why shouldn't we construe that to mean we've attempted to defend our market share? Because within the context of the statement, even if it, in my opinion, your honor, defending share means that we have not lost share. We've sacrificed a bit of price in order to maintain our share. When you say my opinion, I mean, that's when we have to look for objective measurements here. And I'm just trying to figure out how some loss in the market share necessarily means that IMPACT did not defend share. And I'm just trying, I was just kind of struggling with your argument on that and wanted to give you a chance to answer that before your session was up. Because again, I'm not sure how we can measure that objectively. Can I just add, defending share is one potential problem that you have. But I had thought the second falsity essentially was the 10% figure, which in fact was 21%. So it was underestimated. And that was a false representation. I had thought that was your position. Is that your position? That is correct, your honor. That statement has two or three pieces of falsity, depending on how you disconnect them. First, the defending share. And even if that, is not objectively false, and we believe it is, it's still in the context is materially misleading to say that you've defended share, sacrificed a bit of price, and then say that the price that you sacrificed was only 10%, when in fact, it was 21%. So that it's not just, it's not just, you know, you talking about what may be puffery, essentially, in regard to defending share, you're actually specifically saying 10%, as opposed to 21%, which, in your view, is a material misrepresentation. That's correct, your honor. And analysts walked away from that call, observing that, that things were fine with Diclofenac. And that was the message that was not only had they seeded market share, when they said they defended it, but they had also missed that they had also lied about how far the price had fallen. And so, right, so if I you're way over time, but so what I'm taking away, I think your answer to the question we were posing earlier is that you can't view we defended share in isolation, but that it has to be viewed. Because if you view it in isolation, it could be, you know, we tried, or, or even that we the other 10% discrepancy that you've just mentioned. Is that right? That's correct. All right. Thank you very much, Mr. Brooks. I'll give you a few, a couple of minutes, just for rebuttal, because I know we took, we took you over time. Mr. Wald, if you could state your appearance and begin. Thank you. Thank you all for the defendants, appellees. Your honors, I'll start with loss causation. This court's decision in loose, as you know, specifically holds that the announcement of an investigation without more is insufficient to establish loss causation. As we have, this forecloses plaintiff's reliance on the May 15 subpoena disclosure, the November 2016 Bloomberg article, and the January 2017 department of justice actions in intervening in a civil case in which impacts was named just defendant and indicting executives of another company. I just, does the type, let me just ask you, does the type of investigation matter? It looks like Mr. Brooks is, is, is arguing that it does, that it shouldn't be limited to internal investigation announcements, but that there is greater significance when it's a federal investigation or a criminal investigation. Judge Barghia, in our view, what's important is not the nature of the investigation. What is important is whether it's simply the announcement of an, or whether something happens after the or bad practices have been going on. And this court in loose and in Lloyd made that rule clear. The difference in Lloyd was that in Lloyd, there was a subsequent confession, if you will, by the defendant that bad practices had been going on. And that permitted this court to conclude that the earlier stock price drop that surrounded the announcement of the investigation reflected a market understanding. And this is very important because both in the Grigsby case and the B of I case, this court in the last two months has come, has said this again. It reflected the market's understanding that the original subpoena disclosure did not reflect the disclosure of bad facts that couldn't be done in loose. And that's the difference. It doesn't have anything to do with whether it's an internal investigation or a government investigation. Can I, I think you have a strong point that we've never suggested that a criminal civil investigation distinction would matter. Loose certainly does not draw that distinction, but it does stand, I think, for a more limited proposition. I mean, I think the opposing counsel is correct that it says the announcement alone of an investigation without more, you know, that's, that's not enough. I'm concerned that in this case, the announcement on May 11th, there were two announcements on May 11th, as you heard me mention a minute ago, and that there was quite a delay, an eight week delay, approximately in announcing that, um, the, the, the DOJ subpoena. And so my concern is that the rule you're advocating for, sir, is that would really potentially, um, put, um, defendants in a position in these types of cases where, um, a delayed announcement could actually work to insulate women, what, what might otherwise be, um, a valid claim. Your honor, I would submit that the right way to think about the disclosures in this case is that they're in two categories. One is the government investigations, and one is the disclosure of an earnings mess. Can I, can I stop you right there, counsel? I'm going to ask you to go back and say that again, because you froze for just one second. Sure. The, uh, in our submission, your honor, the right way to think about this case is that it involves two categories of disclosures. The disclosure of a government investigation, and that's all of it. We can all come on to that. The second is the disclosure of an earnings mess. And, uh, Luce, your honor controls both of those things. Luce addresses both the disclosure of the investigation and says that's not enough. And Luce also addressed the earnings mess and says that that's not enough quoting and citing this court's decision in the Metzler case. But what about Nuveen? What about Nuveen? You have to reconcile it with Nuveen and First Solar also. Yes, your honor. Uh, First Solar, the plaintiffs say First Solar is the proposition that the plaintiffs may show loss causation by tracing the loss back to the very facts about which the defendant lied. And we don't disagree with that, your honor. The question is, what does it mean to trace back the loss? Jurisprudence of this court has been consistent. And let me point out, your honor, that First Solar cites Dow, Metzler, Oracle, Luce, Nuveen, Lloyd, without suggestion. Council, you're, you're still not answering the question, right? I fully appreciate that. And I, as I said in my earlier, uh, uh, mention of this issue that I'm trying to tug at, plaintiffs are going to have a tough burden because both, right? And I asked him that question. He said, well, our experts are going to, we tease that out. But at the 12B6 stage, his argument is you can't knock me out now because there were two different disclosures on the same day. And what we have to show per, per Nuveen, right? Loss causation may be shown where the alleged fraud is not necessarily revealed prior to the loss. So it would be pursuant to First Solar. It's going to be his obligation to trace it back, as you said, because he can't rely on that investigation, whether it's civil or criminal. But why is it correct for us to do this at the 12B6 stage? And wouldn't that really expand Luce? Your honors respectfully? No. And here's the reason why this court's jurisprudence is consistent that you don't need to disclose the fraud, but it's equally consistent that you need to disclose that the market understands the bad practices. In other words, an earnings miss is not sufficient because all it shows is an earnings miss. And what, and, and this court in Metzler and in Oracle was very clear that you can't back into a claim of loss causation by saying oh, and that's a coded message for a bad act. Right. I think that's all correct. And he says he's gotten more than just the earnings miss. I just want to make sure you have a, I have your full response to that point, please. I forgive me for interrupting. I know it's in a, it's annoying. No, no, not at all. Your honor. I want to, I want to respond to you. He doesn't have anything, your honor. He hasn't alleged anything that fits this court's in the Grigsby case that the plaintiff's burden is to plausibly allege that the decline in defendant's stock price was proximately caused by a revelation of fraudulent activity. That's a quote from Grigsby. I'm familiar with Grigsby. We're not claiming that the fraud needs to come out, but what's important about your sentence and it ties with the B of I decision a month earlier is that it requires a revelation to the market of fraudulent activity. But what the court said in B of I is that the question is whether the plaintiff has plausibly alleged that the market reasonably perceived an event as revealing the falsity of the defendant's prior statements. The market reasonably perceived that's an objective standard as revealing the falsity of the defendant's prior statements. And all they are doing, your honor, is to allege that there was an earnestness on the one hand and a series of announcements that the justice department was conducting an investigation, but there is no discussion. There's no revelation to the market. There were bad practices by my client impact. And let me just say parenthetically, your honor, this is the end of 2020. Five years after that subpoena was issued, impacts has never been named in a regulatory proceeding, criminal or civil. This isn't a situation like B of I where there's a detailed Many other generic drug companies have been indicted or have been sued by the government, state and federal. Impacts has not. There is no indication that the market believe no announcement by any analyst that this meant that impacts it. Indeed, your honor, as Judge Gilliam found, what the market said, what the analyst said was that this was a consequence of competition. And that's what the plaintiffs themselves have alleged in their brief that they've alleged that that was the defendant's response, right? I'm sorry, your honor. That what you said alleged in their brief, they've alleged that that was the defendant's response and media response. Speculation. Is that right? The analyst? Yeah. Yeah. No, I don't. So their brief, their complaint where that's what they allege. Right. So just one final point. Okay. Sorry, Judge Sessions. May I make just one final point? I just want to make sure I have your response to my inquiry about whether I don't think I've heard it yet, whether this wouldn't be a significant expansion of loose because of that eight week delay in the announcement. Could I get your best response on that, please? Yes, your honor. The case was Legion, and it was not briefed in this case because the plaintiffs haven't complained about it. No one has ever complained about the eight week delay. Mr. Brooks is correct. The disclosure was made in connection with normal SEC filings. The Ninth Circuit has repeatedly held consistent with other circuits. Let's have a reasonable period of time to make their disclosures. And here there's been no suggestion that there was wrongdoing. It would be one thing, your honor, suppose if there was any evidence that impacts had done anything wrong. If they had been sued by the federal government, if they had been sued by the state government, that might be one thing. But here we have five years of an uninterrupted record where no one except these plaintiffs have accused them of securities fraud by failing to disclose their participation in the scheme. So I respectfully, your honor, and I know it wasn't briefed, but there are a lot of case law in the Ninth Circuit that the defendants have a reasonable period of time to make their disclosures in their SEC filings. And there's been no, there's been nothing here which changes that. I am familiar with the case law counsel. I'm just waiting to hear the response to my question. Thank you. I don't think it would reflect your honor. I respectfully submit that it would not. So you were talking about market response in a particular market response from investigations, et cetera. So would not a market, a logical market response be a reduction of the stock value? There's a 2.7 percent reduction in market value after the May 11th statement. Would that not be a reflection of the fact that there is a market response to what was submitted in May? Yes, your honor. It does reflect exactly what you said. The difference with loss causation is it does not reflect a market response to the disclosure of bad practices. What it reflects is market response to an announcement that gives rise to risk that there will be bad news in the future. And that's precisely the rationale in Luce, and that's precisely the rationale in Lloyd. And what changes non-compensable, non-actionable market response to the prospect of risk into loss causation is plausibly alleging that the market reasonably perceived the disclosure of what the plaintiffs call the very facts. Those have to be linked in some way to the disclosure that they're challenging. And here they have nothing more than a deed of a subpoena, which is simply investigative and with which impacts complied and produced documents. And I would say, your honor, on the basis of which no regulatory action was taken, a Bloomberg article, which is a newspaper article, which doesn't talk about possibly indicting impacts at all. At paragraph 121, impacts is one of, is named as one of the companies that received a subpoena, but there's nothing in that, those paragraphs that suggest that the feds have focused on impacts whatsoever. And then the decision by the department of justice to intervene in district litigation to protect the integrity of its investigation. And again, they don't mention impacts. It's just a big multi-district litigation. And the district court said, fine, I'm going to allow you to intervene to protect the integrity of your investigation. All of those center of the existence of an investigation. None of them give rise to a plausible allegation that the market understood from those announcements that the, that impacts have been engaged in bad conduct. And that's what, when First Solar talks about what it means. And then sites Dow loose Metzler, Oracle, Lloyd, Nuveen, your honor, judge Kristen Nuveen, all as being consistent with the rule that I have just articulated. That is, that is your honor, a coda, if you will, to that, that is important here to make this, this is First Solar was not revolutionary. It's a per curiam opinion of this court. And it basically said, we've covered this before. And Lloyd tells you what the something more is that's needed. And that wasn't there in loose. The something more is practices. And that announcement your honor is what gave rise to a claim in Lloyd when there was none in loose. Mr. a wall for your time is up. I just, I did have a question for you on the Paul Paul city all city of our price erosion theory. The plaintiff's pled that on, on May 10th, 2016 defendant Wilkinson falsely stated that impact overall price decline was around 10% because the overall price decline was in fact, 21%. We've referred to the statement already here during this oral argument. And it looks like, you know, your response is that the defendant Wilkinson misspoke. And I'm just trying to figure out why that's relevant. That defendant Wilkinson misspoke. Why is that relevant, relevant at this pleading stage? Your honor, the reason it's, it's relevant is because question of what the market understood from Mr. Wilkinson statement and whether the slip-up was material. And here's what I mean by that. On the day of that, Mr. Wilkinson's statement later in the afternoon at a healthcare conference that morning, that morning, and on the earnings call, the company correctly stated CFO reasons correctly stated that the portfolio price decline, excluding Diclofenac and another drug was about 5%. There's no question. That was, that was truthful later that day, repeated that accurate statistic at the healthcare conference. He went on to say though, quote impacts did expect that both Diclofenac and the other drug would meet new competition sometime in the first half of this year. So impacts had to give up a bit of price and its overall price decline 10% and Judge Sessions focused on the 10% and Judge Christian did as well. We agree that was a misstatement, but he meant to say was that the, the impact on him, the impact on impacts is revenue from the overall price decline was around 10%. That was understood by the market cause the next quarter, an analyst in asking questions about this very statement. And this is something that the plaintiffs themselves plead at paragraph three 60 of the second amended complaint says, quote, but in going back to commentary from the first quarter conference call, the impact of pricing was roughly 10% around 10 and a half percent. And that is true. There's no question that the impact of the price decline on revenue was 10%. And the analyst understood that and he understood it because that's exactly what Mr. Reason said on the earnings call. There's no evidence that anyone in the marketplace reacted to the misstatement or the conflation that Mr. Wilkinson engaged in at a healthcare conference later that Mr. Walt. No. No. Okay. Thank you, Mr. Brooks. I think you ran out of time, but I'll give you three minutes. Thank you, your honor. I'd like to address the last point first. And Mr. Walt's arguments are fact-based arguments and do not faithfully portray what's in the complaint and the inferences that can be drawn from what's in the complaint. And so they're not appropriate as a defense at this stage for the falsity or the security stride claim. The assertion that Mr. Wilkinson simply misspoke by dividing in half the price decline for Diclofenac is belied by his phrase a couple of words before, which is that they gave up price. They gave up a bit of price and there was a 10% decline. Analyst walked away from that statement saying, we're comfortable with the guidance. We're comfortable with the way that the market has developed here. And then with respect to that last analyst on the next call, when they actually disclosed the 21%, that analyst is asking Mr. Reasons, the CFO, hey, you said it was 10% last time and now it's 21%. And the response is not in the complaint, but Mr. Reason said, okay, I'll get back to you. There was no indication that that's a discussion of the revenue impact. That's a question that was in direct response to the disclosure about the price decline. As far as the loss causation goes, your honor, BFI, the first BFI recognizes that short of an admission by defendant for a formal finding of fraud, either of which is required, any corrective disclosure will necessarily take the form of contestable allegations of wrongdoing. And that court looked at whether the market could have credibly reacted to the disclosure and whether the market discounted the stock price in a reasonable way in response to that disclosure and concluded, yes, that it did. And that disclosure was an allegation from a disgruntled former employee. That was a complaint allegation. Here we have a subpoena that followed a couple of other subpoenas. A disclosure that impacts was one of the companies that was, and the Bloomberg articles do mention impacts as quote, the most exposed company or one of the most exposed companies here. And then you have the intervention in a complaint that, a civil complaint that alleges price fixing. So just as the whistleblower complaint alleged misconduct in the BFI case, this civil complaint alleged the price fixing, the same price fixing that we're talking about here. There were only seven defendants in the case at the time and two drugs. And the government put its imprimatur on those allegations by saying they matched up with its investigation. All right. Thank you. Judge Christin, Judge Sessions, do you have any further questions for Mr. Brooks? No. All right. Mr. Brooks, Mr. Wald, thank you very much for your oral argument presentations today. New York Hotel Trades Council and Hotel Association of New York City versus Impacts Laboratories is now submitted. Thank you so much. Thank you. Thank you.
judges: Murguia, Christen, Sessions